IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRIAN JOSEPH STOLTIE,

    Plaintiff,                           No. CIV S-08-2584 GEB DAD P

    vs.

JANETTA GERINGSON, et al.,

    Defendants.                    FINDINGS AND RECOMMENDATIONS

                                   /

       Plaintiff is a former state prisoner proceeding pro se and in forma pauperis with an action filed pursuant to 42 U.S.C. § 1983. On November 18, 2010, defendant Ziga filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has not opposed the motion.[1]

/////

/////

/////

---

[1] On January 13, 2011, the undersigned issued an order to show cause, ordering plaintiff to file an opposition to defendant's motion for summary judgment and warning plaintiff that failure to do so could "be deemed a waiver of any opposition to the granting of the motion." Plaintiff still has not filed an opposition to defendant's motion. Accordingly, dismissal pursuant to Federal Rule of Civil Procedure 41(b) would be justified.

1

**BACKGROUND**

Plaintiff is proceeding on his original complaint against defendants Ziga, Lipon, and Geringson.[2] Therein, he alleges as follows. Plaintiff has an extensive history of self-injurious behavior and has serious mental health needs. He further alleges that he was referred by prison officials to a higher level of care for close observation and intense therapy but while awaiting his custody clearance he became extremely agitated and presented a "behavioral problem." According to plaintiff, on February 19, 2008, at his Interdisciplinary Treatment Team meeting, defendant Geringson asked plaintiff to take a higher dose of his Geodon medication and informed him that if he refused she would seek a court order requiring him to accept the increased dose, which in turn would delay his referral to a higher level of care. Defendants Ziga and Lipon were also present at the meeting as part of plaintiff's "treatment team." Plaintiff refused to take the increased dose of Geodon medication, explaining that it made him feel disgusting and filthy. Plaintiff also expressed his desire to let the courts decide the matter. (Compl. at 5, Attach. at 2 & Ex. 3.)

The following day, that defendant Geringson told plaintiff not to worry about the medication increase and that she would discharge him to wherever he wanted to go, which led plaintiff to believe that he would eventually be transferred to a higher level of care. However, on or about February 21, 2009, plaintiff was instead transferred to the Enhanced Outpatient Program/Administrative Segregation Unit. In plaintiff's view, defendants Ziga, Lipon, and Geringson discharged him to this lower level of care unit knowing the dangers it would pose him. Plaintiff informed Dr. Gross, his psychologist, of his new housing unit assignment , and she quickly referred plaintiff back to a higher level of care because she believed the Enhanced Outpatient Program did not provide plaintiff with the level of care that he needed. However,

---

[2] Defendant Ziga is represented by attorneys with the firm of Moreno & Rivera. Defendants Lipon and Geringson are represented by attorneys with the firm of Williams & Associates and have also filed a motion for summary judgment on behalf of defendants Lipon and Geringson which the court will address in separate findings and recommendations.

despite Dr. Gross' efforts, plaintiff obtained an instrument and cut himself. He received treatment and approximately three sutures. Plaintiff was then placed in a crisis unit cell with a razor blade in plain sight on the floor. Plaintiff used the razor blade to inflict additional lacerations on himself. He was then treated again and transferred to the acute care unit. (Compl. Attach. at 2-2b.)

Plaintiff claims that the defendants have been deliberately indifferent to his serious mental health needs in violation of the Eighth Amendment. In terms of relief, plaintiff requests monetary damages. (Compl. at 5, Attach. at 2a.)

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary

1  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

2  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

## OTHER APPLICABLE LEGAL STANDARDS

I. <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of <u>respondeat superior</u> and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not

sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

## II. Eighth Amendment and Adequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, including mental health care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  See also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994); Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.

6

1  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials
2  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in
3  which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94
4  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard
5  to medical care, however, "the indifference to his medical needs must be substantial.  Mere
6  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."
7  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at
8  105-06).  See also Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in
9  diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth
10  Amendment rights."); McGuckin, 974 F.2d at 1059 (same).

**DEFENDANT ZIGA'S MOTION FOR SUMMARY JUDGMENT**

I. Defendant's Statement of Undisputed Facts and Evidence

The defendant's statement of undisputed facts is supported by citations to a declaration signed under penalty of perjury by defendant Ziga.  It is also supported by citations to copies of plaintiff's medical records and copies of plaintiff's responses to discovery requests propounded by the defendants.

The evidence submitted by defendant Ziga establishes the following.  On January 18, 2008, plaintiff was admitted to the psychiatric hospital operated by the Department of Mental Health ("DMH").  DMH operates several psychiatric programs for inmates/patients at CMF, including the inpatient psychiatric hospital known as DMS's Mental Health Crisis Bed ("MHCB").  Plaintiff was admitted to the DMH inpatient care for cutting behavior (self-inflicted injuries).  However, after several weeks, plaintiff's symptoms improved and he was no longer exhibiting behavior that necessitated his continued stay in the inpatient program.  The treating mental health care providers determined that plaintiff's mental health condition had stabilized, and he was ready to be discharged from DMH inpatient care.  Plaintiff was then discharged to CDCR's Enhanced Outpatient Program/Administrative Segregation Unit, the highest level of

1  outpatient psychiatric program run by CDCR's Mental Health Delivery System.  (Def.'s SUDF
2  2-3, Ziga Decl.)
3          On February 19, 2008, defendant Ziga attended a thirty-day review for plaintiff
4  conducted by the DMH attending psychiatrist.  Defendant Ziga typically attended such meetings
5  on a daily basis as part of his role as liaison between DMH and CDCR's Mental Health Delivery
6  System to monitor those inmates who were preparing to return to CDCR's Mental Health
7  Delivery System.  Defendant Ziga's notes from this meeting indicate that the mental health team
8  recommended discharging plaintiff from the MHCB to the Enhanced Outpatient Program.
9  Plaintiff had actually requested a transfer back to the Enhanced Outpatient Program.  Plaintiff did
10 not request a transfer to the acute care unit during the meeting.  Defendant Ziga's notes also
11 indicate that plaintiff refused an increased dosage of Geodon because he "felt dirty."  During the
12 meeting defendant Ziga does not recall hearing Dr. Geringson tell plaintiff that she would seek a
13 court order if he did not consent to taking an increased dosage of Geodon, nor does he recall Dr.
14 Geringson informing plaintiff of any delay in his program placement.  Defendant Ziga's
15 involvement with plaintiff was limited to his attendance at several DMH treatment team
16 meetings.  It is defendant Ziga's practice to observe and take notes regarding the inmates being
17 discussed at these DMH meetings.  (Def.'s SUDF 4-6, Ziga Decl., Ex. B.)
18         Plaintiff denied any suicidal, homicidal, or self-injurious thoughts at the time he
19 was released from MHCB back to the Enhanced Outpatient Program in February 2008.  Before
20 he was discharged to the Enhanced Outpatient Program, multiple mental health staff members
21 noted that plaintiff appeared stable and presented a low risk of suicide.  For example, on
22 February 20, 2008, the records reflect that Dr. Geringson drafted a Narrative Discharge
23 Summary.  Therein Dr. Geringson reported that plaintiff denied suicidal ideations or homicidal
24 ideations throughout his hospitalization and denied wishes to harm anyone.  She noted that
25 plaintiff responded very well to medications (Seroquel, Geodon and Lithium), although he
26 refused to increase the dosage of Geodon to the recommended dosage.  Plaintiff's attitude was

found to be cooperative, positive and resourceful regarding his mental health treatment. Dr. Geringson recommended that plaintiff be discharged to CDCR because he had "improved to the degree that he no longer requires inpatient level of care." Dr. Geringson recommended plaintiff to the Enhanced Outpatient Program to which he was released to on February 21, 2008.

Similarly, during Dr. Steele's initial suicide risk assessment of plaintiff on February 20, 2008, Dr. Steele found that plaintiff's suicide risk appeared low, and the following day, Dr. Sutton psychiatrically cleared plaintiff for placement in the Enhanced Outpatient Program. On February 22, 2008, Dr. DeAlmeida also indicated plaintiff was a low suicide risk. Plaintiff told Dr. DeAlmeida that he did not want to go back to MHCB. Although plaintiff was placed on 24-hour observation status as a precaution, on February 25, 2008, Dr. Gross found that plaintiff no longer needed 24-hour observation. Plaintiff had reported to Dr. Gross "I am really going to try to work with you guys here because I do not want to go back to DMH." Finally, on February 25, 2008, Dr. Bruce noted no apparent significant risk on plaintiff's Suicide Risk Assessment Checklist and indicated that no referral was needed for additional mental health treatment beyond the current treatment plan. (Def.'s SUDF 7, 9-12, Ziga Decl., Exs. B-C.)

On March 4, 2008, Dr. Gross reported on a mental health placement chrono that plaintiff was stable in the Enhanced Outpatient Program. Dr. Gross indicated that plaintiff had no current ideation regarding self-injurious behavior. Plaintiff reported at that time that he had stopped taking his Lithium and was counseled by Dr. Gross on the importance of taking his medications. Plaintiff agreed to start taking all of his medications after their meeting. On March 6, 2008, plaintiff reported to Dr. Gross that he did not currently feel a desire or the need to cut himself. Plaintiff stated that if he felt the need for additional containment and treatment he would inform correctional officers. (Def.'s SUDF 13, Ziga Decl., Ex. C.)

In defendant Ziga's professional medical opinion, based on his review of the records and his experience, there is no indication that the decision to discharge plaintiff from the Mental Health Crisis Bed to the Enhanced Outpatient Program in February 2008 was

9

inappropriate under the circumstances presented at that time.  In any event, defendant Ziga did not provide direct mental health care to plaintiff nor did he ever intentionally or deliberately attempt to delay or deny plaintiff's access to medical or mental health care or treatment.  Finally, defendant Ziga declares that he never intentionally or deliberately disregarded any known risk or serious injury of plaintiff and did not intentionally or knowingly cause plaintiff any pain, suffering, injury, or harm.  (Def.'s SUDF 14-15, Ziga Decl.)

II. <u>Defendant Ziga's Arguments</u>

       Defense counsel argues that under the undisputed facts of this case plaintiff cannot establish deliberate indifference to his serious medical needs.  Specifically, counsel argues that the evidence establishes the following.  Plaintiff was admitted to the DMH's inpatient psychiatric unit and stayed there for more than a month.  Only after psychiatric evaluation was plaintiff released to the highest level of mental health services offered by CDCR, the Enhanced Outpatient Program/the Administrative Segregation Unit.  In fact, plaintiff himself had agreed to and requested the transfer from the inpatient psychiatric unit to the Enhanced Outpatient Program.  After his transfer, plaintiff continued to receive intensive mental health services from multiple mental health professionals who found plaintiff to be mentally stable after repeated visits with him. (Defs.' Mem. of P. & A. at 17.)

       Defense counsel also argues that, while it appears that plaintiff received completely appropriate mental health care under the circumstances presented, the evidence before the court establishes that defendant Ziga was merely a senior psychiatrist at all relevant times and did not provide any direct mental health services to plaintiff.  Rather, counsel argues, Dr. Ziga's involvement in plaintiff's care was limited to attendance at meetings conducted by the DMH attending psychiatrist.  He typically attended such meetings on a daily basis to monitor the inmates who were preparing for return to CDCR.  Accordingly, based on the undisputed facts, counsel concludes that defendant Dr. Ziga did not violate plaintiff's constitutional rights and is entitled to summary judgment in his favor. (Defs.' Mem. of P. & A. at 17.)

## ANALYSIS

Based on the evidence submitted in connection with the pending motion, the court finds that defendant Ziga has borne the initial responsibility of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the mental health care provided to plaintiff. Of course, in considering defendant's motion for summary judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor. However, as noted above, plaintiff has failed to file any opposition to defendant Ziga's motion for summary judgment and therefore has failed to submit any evidence creating a genuine issue of material fact with respect to his claim that defendant Ziga responded to his mental health needs with deliberate indifference. See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

Based upon the evidence submitted in connection with the pending motion, the undersigned finds that a reasonable jury could not conclude that defendant Ziga was deliberately indifferent to plaintiff's medical needs in violation of plaintiff's rights under the Eighth Amendment. Therefore, defendant Ziga's motion for summary judgment should be granted.[3]

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant Ziga's November 18, 2010 motion for summary judgment (Doc. No. 66) be granted; and

2. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written

---

[3] In the pending motion for summary judgment, defense counsel has also argued that defendant Ziga is entitled to summary judgment in his favor based upon qualified immunity. In light of the recommendation set forth above, however, the court will not reach the merits of the qualified immunity arguments.

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 29, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
stol2584.57Ziga(2)