IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRIAN JOSEPH STOLTIE,

     Plaintiff,                   No. CIV S-08-2584 GEB DAD P

     vs.

JANETTA GERINGSON, et al.,

     Defendants.             FINDINGS AND RECOMMENDATIONS

_____/

     Plaintiff is a former state prisoner proceeding pro se and in forma pauperis with an action filed pursuant to 42 U.S.C. § 1983. On November 19, 2010, defendants Lipon and Geringson filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has not opposed the motion.[1]

/////

/////

/////

---

[1] On January 13, 2011, the undersigned issued an order to show cause, ordering plaintiff to file an opposition to defendants' motion for summary judgment and warning plaintiff that failure to do so could "be deemed a waiver of any opposition to the granting of the motion." Plaintiff still has not filed an opposition to defendants' motion. Accordingly, dismissal pursuant to Federal Rule of Civil Procedure 41(b) would be justified.

1

**BACKGROUND**

Plaintiff is proceeding on his original complaint against defendants Lipon, Geringson, and Ziga.[2] Therein, plaintiff alleges as follows. Plaintiff has an extensive history of self-injurious behavior and has serious mental health needs. While incarcerated he was referred to a higher level of care for close observation and intense therapy but while awaiting his custody clearance he became extremely agitated and presented a "behavioral problem." According to plaintiff, on February 19, 2008, at his Interdisciplinary Treatment Team meeting, defendant Geringson asked plaintiff to take an increased dose of his Geodon medication and informed plaintiff that if he refused she would seek a court order requiring him to accept the increased dose, which in turn would delay his referral to a higher level of care. Defendants Ziga and Lipon were also present at this meeting as part of plaintiff's "treatment team." Plaintiff refused to take the increased dose of medication, explaining that it made him feel disgusting and filthy. Plaintiff also expressed his desire to let the courts decide the matter. (Compl. at 5, Attach. at 2 & Ex. 3.)

The following day, defendant Geringson told plaintiff not to worry about the medication increase and that she would discharge him to wherever he wanted to go, which led plaintiff to believe that he would eventually be transferred to a higher level of care. However, on or about February 21, 2009, plaintiff was instead transferred to the Enhanced Outpatient Program/Administrative Segregation Unit. In plaintiff's view, defendants Ziga, Lipon, and Geringson discharged him to this lower level of care knowing the dangers it would pose him. Plaintiff informed Dr. Gross, his psychologist, of his new housing unit, and she quickly referred plaintiff back to a higher level of care because she believed the Enhanced Outpatient Program did not provide plaintiff with the level of care that he needed. However, despite Dr. Gross' efforts, plaintiff obtained an instrument and cut himself. He received treatment and approximately three

---

[2] Defendants Lipon and Geringson are represented by attorneys with the firm of Williams & Associates. Defendant Ziga is represented by attorneys with the firm of Moreno & Rivera and has also filed a motion for summary judgment which the court will address in separate findings and recommendations.

sutures. Plaintiff was then placed in a crisis unit cell with a razor blade in plain sight on the floor. Plaintiff used the razor blade to inflict additional lacerations on himself. He was then treated again and transferred to the acute care unit. (Compl. Attach. at 2-2b.)

Plaintiff claims that the defendants have been deliberately indifferent to his serious mental health needs in violation of the Eighth Amendment. In terms of relief, plaintiff requests monetary damages. (Compl. at 5, Attach. at 2a.)

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

/////

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn. See <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

## OTHER APPLICABLE LEGAL STANDARDS

I. <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of <u>respondeat superior</u> and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

II. <u>Eighth Amendment and Adequate Medical Care</u>

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986); <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, including mental health care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle</u>, 429 U.S. at 106. <u>See</u> also <u>Doty v. County of Lassen</u>, 37 F.3d 540, 546 (9th Cir. 1994); <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1253 (9th Cir. 1982). An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991), <u>overruled on other grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin</u>, 974 F.2d at 1059 (quoting <u>Estelle v. Gamble</u>, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." <u>Id.</u> at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. <u>Farmer</u>, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials

deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I. <u>Defendants' Statement of Undisputed Facts and Evidence</u>

The defendants' statement of undisputed facts is supported by citations to declarations signed under penalty of perjury by defendants Lipon and Geringson. It is also supported by citations to copies of plaintiff's medical records and complaint, and copies of defendants' discovery requests to plaintiff.

The evidence submitted by the defendants establishes the following. Defendant Geringson is a licensed physician and surgeon who has been employed by the Department of Mental Health ("DMH") as a staff psychiatrist at CMF since 2007. Defendant Lipon is a licensed physician and surgeon who was employed by DMH as a senior staff psychiatrist at CMF from February 2008 through December 2008. In December 2008, defendant Lipon was promoted to the Acting Medical Director at CMF for the Vacaville Psychiatric Program. (Defs.' SUDF 1-2, Geringson Decl., Lipon Decl.)

As a senior psychiatrist at CMF, defendant Lipon supervised the work of other mental healthcare professionals and did not typically treat inmates himself. He did not provide direct mental health care or services to plaintiff during plaintiff's incarceration at CMF in 2008. Defendant Lipon's only involvement with plaintiff during the period relevant to the complaint in

this action was his attendance at plaintiff's treatment team meeting on February 19, 2008. (Defs.' SUDF 3-5, Lipon Decl.)

Plaintiff was an inmate at CMF at all times relevant to this lawsuit. He has been diagnosed as suffering from bipolar disease and has a history of cutting himself. Plaintiff functions well when taking mediation. However, plaintiff has a history of initially consenting to medications, then refusing them and deteriorating when he stops taking those medications. (Defs.' SUDF 6-9, Geringson Decl., Lipon Decl., Storrie Decl. & Ex. A.)

CMF is a California Department of Corrections and Rehabilitation ("CDCR") medical psychiatric institution for male prisoners with inpatient and outpatient facilities. DMH operates a licensed, acute care psychiatric hospital within CMF called the Vacaville Psychiatric Program. Plaintiff was a patient at the DMH psychiatric hospital on two prior occasions in 2006 and 2007. Both times he was discharged back to the CDCR Enhanced Outpatient Program after his mental health had stabilized. (Defs.' SUDF 10-12, Geringson Decl., Lipon Decl., Storrie Decl. & Ex. A.)

Upon his arrival at CMF on January 15, 2008, plaintiff was placed in the Enhanced Outpatient Program in Administrative Segregation. On January 18, 2008, plaintiff cut himself and was admitted to a Mental Health Crisis Bed in the DMH psychiatric hospital at CMF. Defendant Geringson was his treating psychiatrist there. At the beginning of his stay in the Mental Health Crisis Bed, a referral to the Intermediate Facility at DMH-Vacaville was discussed, but plaintiff later changed his mind and asked for a transfer back to the Enhanced Outpatient Program in Administrative Segregation. Plaintiff's subsequent behavioral issues and lack of cooperation indicated that plaintiff was not a good candidate for the Intermediate Care Facility in any event. (Defs.' SUDF 13-18, Geringson Decl., Lipon Decl., Hrbacek Decl. & Ex. A., Pl.'s Compl.)

While in the Mental Health Crisis Bed, plaintiff started taking Lithium, Tegretol, Seroquel, Geodon, and Vistaril. Lithium, Tegretol, Seroquel, and Geodon treat bipolar disease,

and Vistaril treats anxiety. On February 15, 2008, plaintiff denied suicidal and homicidal ideations and reported that his ten-current dose of Geodon was helpful. (Defs.' SUDF 19-21, Lipon Decl.)

At the treatment team meeting on February 19, 2008, plaintiff asked to be transferred back to the CDCR Enhanced Outpatient Program. Defendants Geringson and Lipon, Nurse Balmaceda, and Dr. Sharma were all present at the meeting and concurred in the decision to release plaintiff back to the Enhanced Outpatient Program as plaintiff had requested. Plaintiff consistently denied wanting to kill himself and had not cut himself since January 18, 2008. Plaintiff was discharged to the Enhanced Outpatient Program because his condition had improved with medication to the degree that he no longer required the inpatient level of care, and because he denied suicidal, homicidal, or self-injurious thoughts. Unless a patient is clearly not in control of himself, mental health treatment is often necessarily based largely on the patient's subjective reporting of his own symptoms or lack of symptoms. Plaintiff was taking Lithium, Tegretol, Seroquel, Geodon, and Vistaril when he was discharged to the CDCR Enhanced Outpatient Program on February 21, 2008. (Defs.' SUDF 19-26, Geringson Decl., Lipon Decl., Storrie Decl. & Ex. A., Pl.'s Compl.)

There are two mental health programs within the CDCR Mental Health Services Delivery System - the Enhanced Outpatient Program and the Correctional Clinical Case Management System ("CCCMS"). The Enhanced Outpatient Program provides a higher level of mental health care than CCCMS. In the majority of cases, an inmate who improves from a Mental Health Crisis Bed placement will be placed in the Enhanced Outpatient Program. However, each discharge decision is based on professional judgment on a case-by-case basis. (Defs.' SUDF 27-30, Geringson Decl., Lipon Decl.)

Multiple mental health staff members noted that plaintiff appeared stable with a low risk of suicide before and after he was released to the Enhanced Outpatient Program on February 21, 2008. In this regard, on February 20, 2008, Dr. Steele indicated that plaintiff's

suicide risk was "low" on a CDCR Suicide Risk Assessment Checklist. On February 21, 2008, Dr. Sutton psychiatrically cleared plaintiff for Administrative Segregation placement. On February 22, 2008, Dr. DeAlmeida reported on a Suicide Risk Assessment Checklist that plaintiff presented a low risk of suicide. On February 25, 2008, Dr. Bruce indicated on a Suicide Risk Assessment Checklist that plaintiff presented "No Apparent/Significant Risk" of suicide and concluded that a referral to DMH or a higher level of care was unnecessary. (Defs.' SUDF 31-35, Geringson Decl., Lipon Decl., Storrie Decl. & Ex. A.)

On March 4, 2008, Dr. Gross indicated that plaintiff was "maintained at the EOP level of care to monitor his self-injurious behavior," that he was "currently stable in the ASU environment," and that plaintiff had decided to stop taking his Lithium. On March 6, 2008, Dr. Gross noted that plaintiff's suicide risk was "low," his self-injury risk was "medium," his self-mutilation problem was stable, and his last suicide attempt was back in 1997. According to plaintiff's medical records, on March 6, 2008, plaintiff told Dr. Gross that he felt no desire to cut himself but did not want to go to Mule Creek State Prison and that he was "conflicted about how to get his needs met without injuring self . . . feels an urgent need for treatment at the intermediate level of care . . . .and feels going [back to a DMH Mental Health Crisis Bed] will expedite his referral." (Defs.' SUDF 36-38, Geringson Decl., Lipon Decl., Storrie Decl. & Ex. A.)

On March 7, 2008, plaintiff was re-admitted to a DMH Mental Health Crisis Bed after he cut himself on his upper left forearm with a spoon and called an officer to show him the cut. In October 2009, plaintiff told a prison social worker that he claimed to be suicidal in order to get out of prison and go to a DMH hospital. (Defs.' SUDF 39-40, Lipon Decl., Hrbacek Decl. & Ex. A., Storrie Decl. & Ex. A.)

Defendants Lipon and Geringson contend that by not responding to their requests for admissions, plaintiff has admitted that he has no evidence that defendants Lipon and Geringson were deliberately indifferent to his medical needs; that they did not act with gross

10

negligence or violate any of plaintiff's constitutional rights; that he suffered no injuries as a result of their actions or inactions, that in October of 2009 he admitted to a social worker that he was never suicidal but pretended to be so that he could get out of prison and go to the hospital; that defendant Geringson never threatened to institute court proceedings; and that plaintiff actually requested the transfer back to the Enhanced Outpatient Program in February 2008. (Defs.' SUDF 41-45, Carroll Decl. & Exs A & B.)

II. Defendants' Arguments

      Defense counsel argues that there is no evidence before the court that defendants Geringson or Lipon intentionally delayed, denied, or interfered with plaintiff's mental health treatment or were deliberately indifferent to his mental health needs. Specifically, counsel argues as follows. With respect to defendant Geringson, the evidence shows that Dr. Geringson was highly responsive to plaintiff's mental health needs. For example, when plaintiff was discharged to the Enhanced Outpatient Program, he was taking Vistaril, Geodon, Lithium, Seroquel and Tegretol. Plaintiff reported feeling better, denied suicidal or self-injurious thoughts, and had not cut himself during his stay in the Mental Health Crisis Bed. In addition, Dr. Geringson did not unilaterally make the decision to discharge plaintiff. Rather, plaintiff himself as well as other mental health staff members agreed with the decision. Dr. Geringson then released plaintiff back to the most intensive level of mental health care available in CDCR to ensure that he would receive the appropriate mental health treatment. In fact, between February 15, 2008, and March 6, 2008, five other doctors found that plaintiff presented a "low" risk of suicide. (Defs.' Mem. of P. & A. at 8-9.)

      With respect to defendant Lipon, counsel argues that there is no evidence that Dr. Lipon ignored or failed to respond to any of plaintiff's medical or mental health needs. In addition, the evidence shows that Dr. Lipon was not directly involved in providing plaintiff with his mental health care in 2008. Rather, Dr. Lipon was only present at a meeting on February 19, 2008, when the decision was made to discharge plaintiff. There is no evidence before the court

suggesting that Dr. Lipon failed to supervise defendant Dr. Geringson or that he directed or ratified any acts by defendant Geringson that violated plaintiff's constitutional rights. At the February 19, 2008, treatment team meeting plaintiff requested to be released back to the Enhanced Outpatient Program. At that time, plaintiff denied suicidal or self-injurious thoughts. (Defs.' Mem. of P. & A. at 10-11.)

**ANALYSIS**

Based on the evidence submitted in connection with the pending motion, the court finds that defendants Lipon and Geringson have borne their initial responsibility of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the mental health care provided to plaintiff. Of course, in considering defendants' motion for summary judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor. However, as noted above, plaintiff has failed to file any opposition to defendants' motion and therefore has failed to submit any evidence creating a genuine issue of material fact with respect to his claim that the defendants responded to his mental health needs with deliberate indifference. See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106. Based upon the evidence submitted in connection with the pending motion as summarized above, the undersigned finds that a reasonable jury could not conclude that defendants Lipon and Geringson were deliberately indifferent to plaintiff's medical needs in violation of plaintiff's rights under the Eighth Amendment. Therefore, defendants Lipon and Geringson's motion for summary judgment should be granted.[3]

/////
/////
/////

---

[3] In the pending motion for summary judgment, defense counsel has also argued that defendants Lipon and Geringson are entitled to summary judgment in their favor based upon qualified immunity. In light of the recommendation set forth above, however, the court will not reach the merits of those qualified immunity arguments.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant Lipon and Geringson's November 19, 2010 motion for summary judgment (Doc. No. 67) be granted; and

2. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 29, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
stol2584.57Lipon(2)